**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JERAMEY R. BROWN,** **#B-24735,** | |
| **Plaintiff,** | **Case No. 22-cv-01384-SPM** |
| **v.** | |
| **CHAD HASEMYER,** **JESSICA HUFFMAN,** **ANTHONY WILLS,** **FRANK LAWRENCE,** **PITTS,** **C/O CHAMBERS,** **C/O SANDERS,** **LT. SPILLER,** **LT. ZANG,** **LT. SCHOENBECK,** **CHEEKS,** **DEPUTY DIRECTOR JACKSON,** **C/O CHOATE,** **KELLY PIERCE,** **YVETTE BAKER,** **MULHOLLAND,** **ROB JEFFREYS,** **RYAN KILDUFF,** **UNKNOWN 1,** **UNKNOWN 2,** **LT. JOHNSON,** **C/O ADAMS,** **UNKNOWN 3,** **KIM SMITH,** **UNKNOWN 4,** **JOE VOYNAR,** **JIMMIE HOSKINS,** **DEMETRIUS COLE,** **JAMES COULTER,** **KEVIN BRAY,** **STEVEN CRUTCHFIELD,** **ANDREW JAMES,** **UNKNOWN 5,** | |

TIFFANIE CLARK, and
UNKNOWN 6,

                              Defendants.

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Plaintiff Jeramey Brown, an inmate of the Illinois Department of Corrections ("IDOC"), filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights at Menard Correctional Center. The Complaint is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Any portion of the Complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant must be dismissed. 28 U.S.C. § 1915A(b).

## THE COMPLAINT

Plaintiff alleges that in 2018 he was housed in South House at Menard Correctional Center ("Menard"). (Doc. 1, p. 13). At some point that year, a structural crack was discovered in the foundation of South House. In response to the discovery, the inmates housed in South House were moved. While many inmates were transferred to other facilities, Plaintiff was moved to Menard's medium security unit nearby known as "the Hill." [1] At the Hill, Plaintiff asserts he witnessed

---

[1] On pages 9-12 of the Complaint, Plaintiff gives background information regarding his underlying criminal case; alleged collusion between IDOC staff, law enforcement, and prosecutors that obstructed his ability to fully defend himself; hinderance with his ability to prosecute civil lawsuits; and ongoing harassment against him while incarcerated. He states that based on these events, he "is not supposed to ever leave the police/prosecutor friendly Menard Correctional Center. Every transfer request was denied." (Doc. 1, p. 13). Plaintiff claims that while other inmates were transferred to other facilities from South House, he remained at Menard where he "would still be under the eye of Menard's nefarious Internal Affairs." (*Id.*). None of the events that precede the allegations of retaliation, conspiracy, and equal protection violations, which occurred after his transfer to the Hill in 2018, are asserted against or appear to involve any of the named Defendants. Liability under Section 1983 requires personal involvement on the part of a defendant. A "government official is only liable for his or her own misconduct." *Taylor v. Ways,* 999 F. 3d 478, 493 (7th Cir. 2021) (internal citations omitted). Thus, to the extent Plaintiff is attempting to bring claims for constitutional violations based on the events described in pages 9-12, such claims are dismissed without prejudice. Furthermore, the Court does not find the alleged facts described on pages 9-12 relevant to Plaintiff's claims against Defendants and will not summarize these facts in this merit review order.

corruption and misconduct on the part of staff at the facility. Plaintiff alleges that he was retaliated against when he reported the incidents of misconduct to family and friends through email.

Plaintiff asserts that the Hill is ran by current and former staff members of the Internal Affairs Unit. (Doc. 1, p. 13). He states that these staff members have "racist backgrounds" and are known for using racial slurs with inmates and boasting about their memberships to white supremacist groups in the area. Staff would work in tandem with certain inmates to mistreat other prisoners and cover-up misconduct. Plaintiff refers to the group of inmates who assisted staff as the "Whitey Bulger's." (*Id.* at p. 14). This group of inmates received special treatment and were on "the untouchable's list." (*Id.* at p.13, 15). Although IDOC rules limit job assignments to one per inmate, these inmate workers held four to five job assignments each. (*Id.* at 13). These inmates were allowed to engage in prohibited behavior including smoking cigarettes, possessing tobacco products, ordering pizzas, engaging in sexual relationships with staff, and drinking alcohol. (*Id.* at p. 14). Plaintiff asserts that the White Bulger's had a lot of authority at the Hill. They could control the movements of other inmates, hire and fire other inmates from their job assignments, and sold cell placements. (*Id.*). Staff that questioned the special privileges of these inmates were reassigned to work at the main Menard maximum security buildings. (*Id.* at p. 15).

In October 2018, Plaintiff began sending out emails describing the conditions at the Hill and the conduct of the staff. (Doc. 1, p. 16). In one of his emails, Plaintiff described witnessing Superintendent Hasemyer removing high-end washer and dryer units from the facility and loading them onto his truck. (*Id.* at p. 16-17). The units were replaced with old, used, and damaged washers and dryers. (*Id.* at p. 16). In response to the email, Hasemyer had Plaintiff fired from his kitchen job assignment. (*Id.* at p. 17). Hasemyer informed Plaintiff that he would never receive another job assignment for as long as Hasemyer was the superintendent at the Hill. Hasemyer told Plaintiff that Internal Affairs told Hasemyer what Plaintiff was writing in his emails. When a correctional

officer tried to assign Plaintiff to work in the officer's commissary, the assignment was blocked by Hasemyer and inmates Voynar and Rose. Plaintiff was told by Voynar and Rose that he was not a "team player." Plaintiff was then blocked from a job assignment in the inmate commissary by inmate Bray. Plaintiff was later told that the commissaries are where staff and Internal Affairs members "profit from the most." (*Id.*).

On June 5, 2020, Plaintiff witnessed Sergeant Pitts drag an African American inmate who is "mentally challenged" into the "X-house foyer" and assault the inmate. (Doc. 1, p.17). Pitts punched, choked, and kicked the inmate while making threatening, derogatory, and racist statements. Superintendent Hasemyer ran into the foyer and saw Plaintiff standing in the B-wing door. Hasemyer yelled at the correctional officers to lockdown the whole unit. Plaintiff returned to his cell. (*Id.* at 18). Later, Correctional Officer Sanders came to Plaintiff's cell and asked him what he had witnessed. Plaintiff stated that he had witnessed a hate crime. Sanders replied that "they would do the usual, claim the inmate had assaulted one of them, thus, justifying the beating that was given to that small inmate…" That same day, Plaintiff sent an email to his mother telling her he would not be calling due to the lockdown and about the assault he had witnessed. Plaintiff wrote in the email that nothing will be done by Menard officials. Within days of sending the email, Plaintiff states he became a target. (*Id.*).

Around the same time, a new inmate was transferred to B-wing who had previously been in a fight with Correctional Officer Choate. (Doc. 1, p. 18). Choate told Plaintiff and other inmates that the new inmate was a child molester. As a result, the inmate was severely beaten by other inmates and had to be taken out of the prison in an ambulance. Plaintiff later learned that the new inmate had been convicted of burglary and a drug offense and was not in fact a sex offender. Plaintiff asserts that the plan to falsely label the inmate as a sex offender and have him attacked was concocted by staff and inmates Voynar, Cole, Rose, and Unknown 5. They wanted the inmate

attacked on the 3-11 shift to place the blame on a staff member named Davis because Davis did not honor the "untouchable list" of inmate workers and was affiliated with a motorcycle club. (*Id.* at p. 19).

Plaintiff was approached by inmates Voynar, Cole, Hoskins, and Unknown 5 to go and convince the inmate who had been attacked that it had been Davis, not Choate, who told other inmates that he was a child molester. (Doc. 1, p. 19). In return, Plaintiff would receive a job as a "wing porter/janitor." Plaintiff lied and told the inmates that he would go and convince the inmate who was attacked that it had been Davis spreading the rumors. However, Plaintiff did not. (*Id.*).

Also in June 2020, Plaintiff was told by Sergeant Pitts that Internal Affairs wanted to speak with him. (Doc. 1, p. 19). Plaintiff was placed in a small office with Internal Affairs Officers Huffman and Unknown 1. They told Plaintiff they were doing a wellness check and asking Plaintiff if he had any problems with staff. Plaintiff said no. Plaintiff was asked if he had witnessed correctional officers, including Pitts, beating up inmates in C-wing. Plaintiff responded that he lived in B-wing. Unknown 1 then became irritated with Huffman and stated, "he doesn't even live on that wing!" Plaintiff was excused from the meeting. (*Id.*).

Later, Plaintiff was informed by Correctional Officer Sanders that Sergeant Pitts was told by Huffman and Unknown 1 that Plaintiff had told them that Pitts was assaulting inmates on C-wing and that Plaintiff had sent out emails documenting Pitts' assaults on inmates. (Doc. 1, p. 20). Pitts was also told of an email Plaintiff allegedly wrote documenting Pitts walking to his truck with an empty cup and returning with a full cup and that Pitts smelled of alcohol. Inmate Voynar told Plaintiff that Pitts stated, "I'm taking that race traitor down!" (*Id.*).

Not long after, Plaintiff witnessed Pitts assault another "small black inmate." (Doc. 1, p. 20). Plaintiff sent an email describing the incident and how Menard's administrators and the Internal Affairs either tun a "blind-eye to it or flat out condone it." (*Id.* at p. 21).

Plaintiff was then taken to speak to Huffman and Unknown 2. (Doc. 1, p. 21). They told Plaintiff to stop "with what he was saying in his emails to family and friends" and that if he kept on with the emails then things would become difficult for him.

A few days later, Plaintiff was approached by Correctional Officer Sanders and told that he was being placed on "dead-lock (locked in the cell)." (Doc. 1, p. 21). Sanders also stated that Plaintiff was losing his job and a disciplinary report was coming from Internal Affairs with the charge of giving false information to an employee. Plaintiff asked why he was being placed on dead-lock because the charge does not "even carry segregation time?" Sanders responded, "we just want you gone. You've pissed off too many of the top-dogs!" (*Id.* at p. 21-22). An hour later, Plaintiff was in the dayroom when Pitts received a call from Hasemyer informing Pitts that the charges were increased, and Plaintiff was being sent to segregation for the charge of impeding an investigation. When the call came through, Pitts, Sanders, and inmates Voynar, Coulter, Hoskins, Cole, Bray, Crutchfield, and Unknown 5 began clapping and making whooping noises. Sanders said, "you'll be doing a year in segregation for that one!" (*Id.* at p. 22).

 Plaintiff was placed in hand cuffs and taken to the shake-down area. (Doc. 1, p. 22). When he asked about his property, he was told, "you know what's taking place, it's being divvy'd[sic] up!" The officer told Plaintiff that inmates Voynar, Cole, Hoskins, Bray, Crutchfield, Coulter, James, and Unknown 5 "have been plotting on your property for weeks!" Plaintiff was transferred to segregation at Menard's maximum-security unit. (*Id.* at p. 23). Within a day or two, Choate and Chambers came to his cell and told him that the majority of his property was distributed amongst "their guys." He was told that he was never returning to the Hill and that Wardens Wills and Lawrence were "riding with them on this. Both wardens had Plaintiff reclassified as maximum security." Plaintiff received a disciplinary report dated July 1, 2020, for giving false information to an employee and for impending an investigation. The disciplinary report was authored by

Page 6 of 21

Internal Affairs Officer Huffman. (*Id.*).

When Plaintiff received his personal property inventory receipt, a majority of his property was unaccounted. (Doc. 1, p. 23). The segregation property officer brought Plaintiff only some of his belongings, which consisted of some clothing, hygiene items, and his fan. The fan had been damaged. (*Id.*).

The disciplinary hearing was held on July 7, 2020. (Doc. 1, p. 23). The Chairperson of the Adjustment Committee was Lieutenant Schoenbeck. Schoenbeck works at the Hill on Fridays and Saturdays. He told Plaintiff that he was guilty the moment the disciplinary report had been issued. Plaintiff pled not guilty and made a statement. Schoenbeck stated during the hearing that Plaintiff had made formidable enemies and "knows what to expect!" (*Id.*). Plaintiff was found guilty of the charges and sentenced to 30 days in segregation, 30 days C-grade status, and 30 days of privilege loss. (*Id.* at p. 24). Plaintiff then wrote letters and grievances about his situation. He had his family call and speak with Wills, Lawrence, Hasemyer, and other staff members. (*Id.*).

Plaintiff's first grievance resulted in the Administrative Review Board ("ARB") expunging the disciplinary report from his record. (Doc. 1, p. 24). The ARB found that Plaintiff's conduct of sending information to his mother did not correspond with the charge of giving false information to an employee and that the charge of impeding an investigation was not substantiated. (*Id.*). Plaintiff was released from segregation but remained in Menard maximum-security unit. (*Id.* at p. 28). When he was placed in general population at Menard maximum-security, Lieutenant Spiller had all of Plaintiff's property held for over month. Plaintiff was given his damaged TV and radio, a small amount of clothing, and hygiene items. Major Rowland tried to call Hasemyer to find out Plaintiff's status and why Plaintiff was still the maximum-security unit. Rowland was told to mind his business and that Internal Affairs had placed a hold on Plaintiff. (*Id.*).

On November 5, 2020, Plaintiff was interviewed by Intel Investigator Cheeks. (Doc. 1, p.

24). Cheeks asked Plaintiff about Hasemyer misusing the Menard Road Crew. Plaintiff told Cheeks that Hasemyer uses the crew to do yard work around his brother's house near the Hill. (*Id.*). Plaintiff further explained that Hasemyer's brother is going through a divorce, and the members of the road crew had been told not to speak to the sister-in-law if she tries to talk with them. (*Id.* at p. 24-25). Cheeks asked if Plaintiff had shared this information with anyone, and Plaintiff said no. Plaintiff then told Cheeks about the corruption and misconduct of staff at the Hill. (*Id.* at p. 25). Cheeks asked Plaintiff if he had a death wish. Plaintiff stated that he wanted transferred to Graham Correctional Center so he could attend school, he wanted Sergeant Pitts fired, and he wanted his property recovered and the broken items repaired. Cheeks told Plaintiff that "he had a meeting scheduled with his boss and that he would get back with Plaintiff very soon." (*Id.*).

Around December 2020 or January 2021, Plaintiff was taken to the Internal Affairs by the Tactical Unit. (Doc. 1, p. 26). Plaintiff met with Lieutenant Zang, who told Plaintiff that he was the new head of Internal Affairs. Zang was interested in Plaintiff's grievances, particularly the grievance in which Plaintiff complained that even though his disciplinary report had been expunged, he remained in maximum-security unit of Menard and was not transferred back to a medium-security part of the facility. Zang told Plaintiff that "it was in his best interest to let it all go." Zang told Plaintiff that once everything died down, "he'd be transferred out quietly. But, under no circumstances could he ever return to the Hill." Zang told Plaintiff that he would assist Plaintiff in receiving his property back from the other inmates who had taken it. Plaintiff told Zang that some inmates were able to retrieve his property from the inmates who assisted the Internal Affairs unit and stole his property. Zang said he would go to the Hill and gather his property. (*Id.*).

Plaintiff never heard back from Zang. He sent an inquiry to Zang and received another disciplinary report written by Zang and witnessed by Cheeks claiming that Plaintiff had committed

the offense of trading and trafficking. (Doc. 1, p. 27). Inmates Voynar, Coulter, James, Cole, Hoskins, Crutchfield, Bray, and Unknown 5 had lied and told Internal Affairs and Intel staff that Plaintiff's property was not stolen, but rather that Plaintiff had gifted the property to them. (*Id.*).

Plaintiff had another disciplinary hearing before Lieutenant Schoenbeck. Schoenbeck told Plaintiff that he was not going to place Plaintiff in segregation. Plaintiff responded that Schoenbeck could not recommend segregation since the charge did not "carry seg time." Plaintiff also objected to Schoenbeck conducting the hearing due to bias. Schoenbeck stated, "I can do whatever the fuck I want, who's gonna stop me?" Schoenbeck stated that Plaintiff was lucky for having the first disciplinary report expunged but now "we got one of our own in the ARB waiting on your next grievance." (*Id.*). Plaintiff states that Schoenbeck was clearly referring to Ryan Kilduff, who dismissed his next grievance and every grievance since.

On November 22, 2021, Plaintiff was transferred to Illinois River Correctional Center. (Doc. 1, p. 34).

### PRELIMINARY DISMISSALS

Plaintiff claims that since his arrival at Illinois River Correctional Center, he has been harassed by Internal Affairs staff members Johnson, Adams, and Unknown 3. (Doc. 1, p. 34). Every time he attempts to send a message discussing Menard or Illinois River Correctional Center, Internal Affairs blocks the message from being sent and returns the message to Plaintiff with a note saying the message is inappropriate. Plaintiff claims that Adams and Johnson have told him, "He shouldn't get comfortable, he'll be back in Menard where they want him as soon as Wills and Lawrence retire." He asserts that Warden Clark is a drunk who no one ever sees and that the facility is ran by Johnson.

The Court finds that the claims against Defendants at Illinois River Correctional Center are improperly joined in this action. *See George v. Smith,* 507 F. 3d 605, 607 (7th Cir. 2007). Plaintiff's

Page 9 of 21

allegations of mail interference are unrelated to his retaliation claims asserted against staff at Menard and brought against a new group of defendants for events that take place at a different institution. FED. R. CIV. P. 20. *See also Owens v. Evans,* 878 F. 3d 559, 561 (7th Cir. 2017). Although Plaintiff attempts to join the claims against Clark, Johnson, Adams, and Unknown 3 by alleging that the conspiracy to violate his constitutional rights continues, this statement is conclusory. There are no allegations to support Plaintiff's assertion that Clark, Johnson, Adams, and Unknown 3 have entered into an agreement with the other Defendants, who work at an entirely different institution. As these allegations belong in a separate lawsuit, the Court dismisses the claims against Clark, Johnson, Adams, and Unknown 3 from this matter without prejudice. FED. R. CIV. P. 21.

All claims are also dismissed against Unknown 6. Plaintiff asserts that he was supposed to be transferred to Pinckneyville Correctional Center, but Unknown 6, who works in the transfer office, changed his transfer to Illinois River Correctional Center, which is another Internal Affairs ran prison similar to Menard. (Doc. 1, p. 34). Plaintiff does not have a constitutional right to be housed at a certain facility, and the act of assigning him to be housed at Illinois River Correctional Center does not violate the Constitution.

### DISCUSSION

Based on the allegations in the Complaint and Plaintiff's articulation of his claims, the Court designates the following claims in this pro se action:

> **Count 1:**  Defendant Hasemyer, in violation of the First Amendment, retaliated against Plaintiff for sending emails about the conditions at the Hill and staff conduct by having Plaintiff fired from his job assignment and preventing Plaintiff from receiving another job assignment.

> **Count 2:**  Defendants Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Jackson, Choate, Unknown 1, Unknown 2, Unknown 4, Wills, Lawrence, Chambers, Kilduff, Voynar, Cole,

Coulter, Hoskins, James, Crutchfield, Bray, and Unknown 5, in violation of the First Amendment, retaliated against Plaintiff for sending emails about the conditions at the Hill and staff conduct by (1) issuing Plaintiff false disciplinary reports and finding him guilty of the false charges; (2) keeping Plaintiff in a maximum-security institution after his disciplinary report was expunged; (3) having Plaintiff moved to a high aggression cell-house following release from segregation; and (4) stealing, damaging, and withholding Plaintiff's property.

**Count 3:**     Claim against Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Jackson, Choate, Unknown 1, Unknown 2, Unknown 4, Wills, Lawrence, Chambers, Kilduff, Pierce, Baker, Mulholland, Jeffreys, Smith, Voynar, Cole, Coulter, Hoskins, James, Crutchfield, Bray, and Unknown 5 for conspiring to violate Plaintiff's First Amendment Rights.

**Count 4:**     Claim against Wills, Lawrence, and Unknown 4 for allowing Plaintiff to remain in a maximum-security unit after his disciplinary report was expunged in violation of his due process rights.

**Count 5:**     Claim against Huffman, Unknown 1, Unknown 2, Zang, Spiller, Cheeks, Wills, Lawrence, Jackson, and Jeffreys for violating Plaintiff's equal protection rights by treating him differently because he would not act as informant.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly*[2] pleading standard.**

### Retaliation: Counts 1 and 2

In order to state a claim for retaliation under the First Amendment, the plaintiff must demonstrate that (1) he engaged in constitutionally protected speech, (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *Antoine v. Ramos*, 497 F. App'x 631, 634 (7th Cir. 2012).

---

[2] *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

## Count 1

Count 1 will proceed against Hasemyer for having Plaintiff fired from his job in the dietary department and preventing from receiving another job assignment in retaliation for Plaintiff complaining of staff conduct and conditions at the Hill in emails sent to family and friends. (*See* Doc. 1, p. 16-17).

## Count 2

Count 2 will be dismissed in part and proceed in part. Plaintiff alleges generally that Defendants Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Jackson, Choate, Unknown 1, Unknown 2, Unknown 4, Wills, Lawrence, Chambers, and Kilduff subjected him to harassment and punished him for sending emails complaining about prison conditions by transferring him to a less desirable unit of Menard, refusing to transfer him back to a medium-security facility, instructing inmates to steal his property, issuing false disciplinary charges, and moving him to a high aggression cell-house in Menard. (Doc. 1, p. 29). The facts alleged, however, do not support the contention that every Defendant participated in each act of retaliation described. *See Thomson v. Washington*, 362 F.3d 969, 970–71 (7th Cir. 2004) (a complaint must put the defendant on notice of the claims and the grounds they rest upon, along with "some indication ... of time and place"). Accordingly, Count 2 will proceed as follows:

- Count 2 will proceed against Hasemyer, Pitts, Huffman, Unknown 1, Unknown 2, Wills, and Lawrence for issuing Plaintiff the false disciplinary report dated July 1, 2020. (*See* Doc. 1, p. 21, 23, 31-32).

- Count 2 will proceed against Lieutenant Schoenbeck for finding him guilty at both disciplinary hearings. (*See* Doc. 1, p. 23-24, 27).

- Count 2 will proceed against Spiller and Hasemyer for withholding Plaintiff's property for a month after he was released from segregation. (Doc. 1, p. 28).

- Count 2 will proceed against Hasemyer, Spiller, Wills, and Lawrence for having Plaintiff reclassified and remain at Menard maximum-security facility in a cell-house with highly aggressive inmates after his disciplinary report had been expunged by the Administrative Review Board. (Doc. 1, p. 23, 28, 30).

- Count 2 will proceed against Pitts, Sanders, Chambers, and Choate for instructing other inmates to steal his property. (Doc. 1, p. 22-23, 32).

- Count 2 will proceed against Cheeks and Zang for issuing Plaintiff the second false disciplinary report. (Doc. 1, p. 25-26).

- Count 2 will proceed against Kilduff for denying Plaintiff's grievance. (Doc. 1, p. 27, 33).[3]

Count 2 is dismissed as to Unknown 4. Plaintiff states that this individual was the placement officer at Menard and "refused to do their job even when instructed to by the Administrative Review Board...their inaction speaks volumes." (Doc. 1, p. 32). The conclusion that Unknown 4 did not transfer Plaintiff out of the maximum-security facility in retaliation for his complaints is speculation and does not survive screening. *See Conner v. Schwenn,* 821 F. App'x 633, 636 (7th Cir. 2020).

Count 2 is also dismissed against the inmate defendants Voynar, Cole, Coulter, Hoskins, James, Crutchfield, Bray, and Unknown 5. "To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that this deprivation occurred at the hands of a person or persons acting under the color of state law." *D.S. v. E. Porter Cty. Sch. Corp.,* 799 F.3d 793, 798 (7th Cir. 2015)

---

[3] Generally, the denial of a grievance, standing alone, is not sufficient for the Court to plausibly infer a retaliatory motive on the part of a defendant. *See Zimmerman v. Tribble,* 226 F.3d 568, 573 (7th Cir. 2000). However, the denial of Plaintiff's grievance in combination with the statement by Schoenbeck that Kilduff is "one of our own" is sufficient for Plaintiff's retaliation claim against Kilduff to survive merit review. (Doc. 1, p. 27).

(citing *Buchanan–Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). A person acts under the color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). A private party may be found to act under the color of law if he has a "meeting of the minds and thus reached an understanding with a state actor to deny plaintiffs a constitutional right." *Wilson v. Warren Cty. Ill.* 830 F. 3d 464, 468 (7th Cir. 2016). The private party and the state actor "must share a common unconstitutional goal." *Id.* (quoting *Cunningham v. Southlake Ctr. For Mental Health, Inc.,* 924 F. 2d 106, 107 (7th Cir. 1991)).

Plaintiff attempts to sue the inmate defendants for retaliation by describing them as state agents and informants employed by Internal Affairs. (Doc. 1, p. 5-6, 29). He alleges that the inmate defendants were acting in conspiracy with IDOC staff in an attempt to silence him. (*Id.* at p. 29). This conclusory assertion of conspiracy to retaliate is not supported by the facts contained in the Complaint. Throughout the Complaint, Plaintiff does not describe a concerted effort on the part of the inmate defendants and the staff of Internal Affairs with the common goal to violate his First Amendment rights, but rather, a relationship where the inmate defendants acted as informants on all prisoners and performed other general acts of misconduct in exchange for various benefits and privileges. (*Id.* at p. 13-16, 19). Plaintiff was told by a staff member that his property was given to and divided up amongst the inmate defendants. (*Id.* at p. 22). He emphasis that at the Hill snitches obtain favorable treatment and states, "They are allowed to steal other prisoners[sic] personal property without any consequences." (*Id.* at p. 36). Thus, not only has Plaintiff failed to plead that the inmates were acting under the color of law but also that they were motivated in taking his property by his constitutionally protected speech.

Finally, Count 2 is dismissed as to Deputy Director Jackson. Plaintiff alleges that after the ARB expunged the disciplinary report from his record, he wrote letters to various defendants,

including Jackson. (Doc. 1, p. 24). Plaintiff alleges that Cheeks told him during the interview that Cheeks's boss, who is Jackson, sent Cheeks to interview Plaintiff. (*Id.*). Plaintiff asserts that Jackson "must have" instructed Cheeks to initiate more disciplinary charges against Plaintiff. (*Id.* at p. 33). These allegations are not sufficient to support a claim of retaliation against Jackson. Jackson cannot be liable solely based on Jackson's supervisory role, and the assertion that Jackson was directly involved in the issuing of disciplinary charges against Plaintiff and had a retaliatory motive is conclusory. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

### Count 3

A civil conspiracy claim requires the plaintiff to identify the parties involved in the conspiracy, the general purpose, and the approximate date. *Walker v. Thompson*, 288 F.3d 1005, 1007-08 (7th Cir. 2002); *Lewis v. Washington*, 300 F.3d 829, 831 (7th Cir. 2002). "For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir.1996).

Count 3 shall proceed against Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Choate, Unknown 1, Unknown 2, Wills, Lawrence, Chambers, and Kilduff.

Count 3 is dismissed as to the inmate defendants Voynar, Coulter, Hoskins, Cole, Crutchfield, Bray, James, and Unknown 5 for the reasons articulated above.

Count 3 is dismissed as to Jackson, Unknown 4, Jeffreys, and Smith. Plaintiff has not sufficiently pled that these Defendants violated his First Amendment rights, and so, there can be no civil rights claim for conspiracy against these Defendants.

Plaintiff also claims that Defendants Mulholland, Pierce, and Baker were involved in the conspiracy solely because they denied his grievances. (Doc. 1, p. 33). The denial of a grievance is not enough to plead a colorable claim that Defendants were in agreement with other conspirators to violate Plaintiff's First Amendment rights or that they had a retaliatory motive against Plaintiff.

Count 3 is dismissed as Mulholland, Pierce, and Baker.

## Count 4

In order state a claim for a due process violation, the plaintiff must plead that he was deprived of a protected liberty interest, and if so, what process was due. "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement" *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). *See also Zimmerman v. Tribble,* 226 F. 3d 568, 572 (7th Cir. 2000) ( "the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence."). Therefore, a protected liberty interest is implicated only if, because of the disciplinary conviction, the plaintiff was subjected to "atypical and significant hardship…in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

Plaintiff has not sufficiently pled that he was denied a liberty interest due to his transfer, and therefore, due process was not required. He does not describe his conditions at the maximum-security unit as so "atypical or difficult that he had a liberty interest in his transfer to medium-security custody." *Earls v. Buske,* 20No. 22-1193, 22 WL 3928515, at *2 (7th Cir. Aug. 31, 2022). Other than stating he was housed with aggressive inmates, he does not include any details about his confinement at all. Accordingly, Count 4 is dismissed.

## Count 5

Plaintiff asserts that he has the constitutional right not to be forced to serve as an informant. (Doc. 1, p. 36). He claims that there are disparities in treatment between those who do not act as informants and the informants, who he labels the "snitch class." Members of the snitch class receive certain privileges such as job assignments, the opportunity to participate in educational classes, and avoid receiving disciplinary reports. Members of the snitch class also are allowed to smoke, "lock up" late in the evening, receive property from other inmates, and have a say in the

cell movement, job assignments, and transfers of other inmates. Plaintiff states that he has had "several rights of his violated by Internal Affairs, Huffman, Unknown 1, Unknown 2, Zang, Spiller, and Cheeks because he would not inform on any convicts." (*Id.*).

Although Plaintiff discusses the differences between informants and non-informants, he does not specify or describe conduct suggesting intentional discrimination against him on the part of the named Defendants. *See McRae v. Myers*, No. 22-1821, 2023 WL 2423590, at *3 (7th Cir. Mar. 9, 2023) (citing *Fares Pawn, LLC v. Indiana Dep't of Fin. Insts.*, 755 F.3d 839, 846 (7th Cir. 2014)). The misconduct he ascribes to Defendants elsewhere in the Complaint is alleged to be due to the fact that Plaintiff was complaining about the conditions of his confinement and staff conduct, not because he was not a member of the snitch class. And as previously stated, conclusory statements do not state a claim. *See Brooks v. Ross*, 578 F. 3d 574, 581 (7th Cir. 2009). Count 5 is dismissed.

### MOTION FOR RECRUITMENT OF COUNSEL

Plaintiff has filed a Motion for Recruitment of Counsel (Doc. 10, 11). The Court has inherent authority to recruit counsel to ensure the orderly prosecution of litigation in the district. When considering whether counsel is necessary to assist a pro se plaintiff, the Court must ask "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007).

The Court finds that the circumstances in this case warrant recruitment of counsel, and the motion for counsel is **GRANTED.** Plaintiff has demonstrated reasonable, but unsuccessful, efforts to find counsel on his own before seeking assistance from the Court. The Court agrees that given the nature of his retaliation and conspiracy claims, Plaintiff will be unable to represent himself in this matter. Not only can free speech and conspiracy claims be legally complex, but Plaintiff will

be unable to investigate and fully conduct the discovery needed now that he has been transferred to a different facility. He most likely will need witness statements from those working and living at Menard, which will be difficult for him to obtain, and documents that will be deemed confidential. Accordingly, due to the difficulties the Court foresees Plaintiff facing, the Court finds it prudent to recruit counsel early on in this case. Counsel will be recruited by separate order.

### NOTICE OF CONTINUING VIOLATIONS

After commencing this lawsuit, Plaintiff filed a document entitled "Notice to the Court of Continuing Violations." (Doc. 15). In this document, Plaintiff asserts that at Illinois River Correctional Center staff are interfering with his incoming and outgoing privileged mail regarding his underlying criminal case. He states that once discovery begins in this matter, there will be damaging e-mails and texts discovered between Defendants, prosecutors, and the police in Plaintiff's criminal case.

To the extent Plaintiff is attempting to supplement or amend the Complaint with additional allegations, the request is denied. Plaintiff has been allowed to supplement the Complaint and the motion for recruitment of counsel with additional exhibits once as a courtesy. (*See* Doc. 8, 11). As a general rule and going forward, Plaintiff is advised that the Court does not allow piecemeal amendments. An amended complaint is a single document that must stand on its own without reference to any other pleading and include all claims against all defendants and his requested relief. To the extent Plaintiff is seeking some sort of emergency injunctive relief, the document also fails as a motion under Federal Rule of Civil Procedure 65. Plaintiff does not request any kind of relief from the Court or demonstrate that he will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition to his motion.

### UNIDENTIFIED DEFENDANTS

Plaintiff will have the opportunity to engage in limited discovery to ascertain the identity

of the unknown defendants, Unknown 1 and Unknown 2. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009). In this case, Warden Wills is already named in his official capacity and shall respond to discovery aimed at identifying these unknown defendants. Guidelines for discovery will be set in a separate order. Once the names of the unknown defendants are discovered, Plaintiff shall file a motion to substitute the newly identified defendants in place of the generic designations in the case caption and throughout the Complaint.

### OFFICIAL CAPACITY CLAIMS

Plaintiff brings his claims against Defendants in their official and individual capacities. To the extent that Plaintiff is seeking injunctive relief, Defendant Wills, the Warden of Menard, is the most appropriate official capacity defendant. *See generally Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Allowing Plaintiff to proceed with an official capacity claim against the remaining Defendants would be redundant. Therefore, the official capacity claims against these Defendants are dismissed with prejudice. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (state officials named in their official capacities may not be sued for monetary damages).

### DISPOSITION

For the reasons stated, the Complaint survives preliminary review pursuant to Section 1915A. **COUNT 1** shall proceed against Hasemyer. **COUNT 2** will proceed in part against, Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Choate, Unknown 1, Unknown 2, Wills, Lawrence, Chambers, and Kilduff, but is **DISMISSED without prejudice** as to Jackson, Unknown 4, Voynar, Cole, Coulter, Hoskins, James, Crutchfield, Bray, and Unknown 5. **COUNT 3** will proceed against Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Choate, Unknown 1, Unknown 2, Wills, Lawrence, Chambers, and Kilduff, but is **DISMISSED without prejudice** as to Voynar, Coulter, Hoskins, Cole, Crutchfield, Bray, James, Unknown 5, Jackson, Unknown 4, Jeffreys, Smith, Mulholland, Pierce, and Baker. **COUNTS 4**

and **5** are **DISMISSED without prejudice.** All claims against Clark, Johnson, Adams, Unknown 3, and Unknown 6 are **DISMISSED without prejudice.** The Clerk of Court is **DIRECTED** to **TERMINATE** the following Defendants as parties to this case: Voynar, Coulter, Hoskins, Cole, Crutchfield, Bray, James, Unknown 5, Jackson, Unknown 4, Jeffreys, Smith, Mulholland, Pierce, Baker, Johnson, Adams, Unknown 3, Clark, and Unknown 6.

The Clerk of Court **SHALL** prepare for Hasemyer, Huffman, Pitts, Sanders, Spiller, Zang, Schoenbeck, Cheeks, Choate, Wills, Lawrence, Chambers, Kilduff, and Unknown 1 and Unknown 2 (once identified) the following: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendants' place of employment. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on the Defendant, and the Court will require the Defendant pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant can no longer be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, his last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants should respond to the issues stated in this Merit Review Order.**

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 7 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:   August 23, 2023**

_s/Stephen P. McGlynn_
**STEPHEN P. MCGLYNN**
**United States District Judge**

NOTICE TO PLAINTIFF

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days** or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.