**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

JERAMEY BROWN,

      **Plaintiff,**

v.

CHAD HASEMYER, *et al.*,

      **Defendants.**

Case No. 22-cv-01384-SPM

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

 This matter is before the Court on a motion for partial summary judgment on the issue of exhaustion of administrative remedies filed by Defendants Armbruster-Huffman, Chambers, Cheeks, Choate, Frazer, Hasemyer, Kilduff, Lawrence, Pitts, Schoenbeck, Spiller, Williamson, Wills, and Zang. (Doc. 70). Plaintiff filed a response in opposition to the motion. (Doc. 84). For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

### BACKGROUND

 Plaintiff Jeramey Brown, an inmate of the Illinois Department of Corrections (IDOC), filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights that occurred while at Menard Correctional Center's medium-security facility, referred to as "the Hill" or "M.S.U.," and the more commonly known maximum-security facility, often referred to simply as "Menard." Plaintiff asserts that because he sent emails to family and friends complaining about staff misconduct and prison conditions, Defendants conspired with one another to retaliate against him, violating his First Amendment rights. (Doc. 61).

 In the First Amended Complaint (Doc. 61), Plaintiff alleges the following: In 2018, he was

transferred from Menard's maximum-security facility to the Hill because of a structural crack in
the building where he was housed. Once he arrived, he began witnessing corruption, misconduct,
and racist behavior on the part of staff at the Hill. Specifically, Plaintiff witnessed Defendant
Superintendent Hasemyer removing high-end washer and dryer units from the facility, loading
them onto his truck, and replacing the units with old, used, and damaged washers and dryers. He
sent an email to his family describing what he saw and, after he sent the email, he was fired from
his kitchen job by Hasemyer and prevented from receiving another job assignment.

In July 2020, Plaintiff states that he witnessed Defendant Sergeant Pitts assault and harass
an African American inmate without any cause. The whole housing unit was placed on lockdown
in response to the incident. Plaintiff sent an email to his mother informing her that he would not
be calling due to the lockdown, and he also told her about the assault that he had witnessed. After
sending the email, Plaintiff was interviewed by Defendants Armbruster-Huffman and Williamson,
who were members of the Internal Affairs Unit. Defendants called the interview a "wellness-
check," and they asked Plaintiff if he had seen any correctional officers, including Pitts, beating
up inmates. During the interview, Plaintiff denied having any problems with staff.

Not long after the interview, Plaintiff saw Pitts assault another African American inmate.
Plaintiff sent a second email describing the most recent assault. Plaintiff expressed in the email
how the administration and the Internal Affairs Unit would either turn a blind eye to the situation
or "flat out condone it." Plaintiff was subsequently interviewed again by the Internal Affairs Unit,
this time by Defendants Armbruster-Huffman and Frazer. During the interview, Plaintiff was told
to "stop what he was saying in his emails to family and friends and that if he kept on with the
emails then things would become difficult for him."

A few days later, Plaintiff was placed locked in his cell on "dead-lock." He was told by a
correctional officer that a disciplinary report from the Internal Affairs Unit was coming with the

Page 2 of 27

charge of giving false information to an employee. Plaintiff asked why he was being placed on dead-lock when the charge of giving false information "does not carry segregation time." Plaintiff was told, "We just want you gone. You've pissed off too many of the top-dogs!" An hour later, Pitts received a call from Armbruster-Huffman informing Pitts that the charge had been increased, and Plaintiff was now being sent to segregation.

Plaintiff was transferred from the Hill to segregation at Menard's maximum-security facility. Plaintiff was issued a false disciplinary report dated July 1, 2020, charging him with giving false information to an employee and for impeding an investigation. On July 7, 2020, he had a hearing before the Adjustment Committee, which included Defendant Schoenbeck, and was wrongfully found guilty of the charges. Plaintiff was sentenced to thirty days in segregation, and many of his property items were permanently confiscated and damaged. Plaintiff filed grievances about the disciplinary charges and hearing procedures, and the disciplinary report was eventually expunged from his record by the Administrative Review Board. Plaintiff was released from segregation, but he was not transferred back to the Hill. Instead, he remained in general population at the maximum-security facility because of a "hold" placed on him by the Internal Affairs Unit.

Plaintiff asserts that he was later issued another disciplinary report falsely accusing him of trading and trafficking property. His new disciplinary report was heard again by Schoenbeck. Plaintiff objected to Schoenbeck conducting the hearing due to bias. Following the hearing, Plaintiff's subsequent grievances were denied by Administrative Review Board Member Defendant Kilduff, who Schoenbeck had described at the hearing as "one of our own." On November 22, 2021, Plaintiff was transferred to Illinois River Correctional Center.

Following a review of the First Amended Complaint, Plaintiff is proceeding on the following claims:

**Count 1:**    Defendant Hasemyer, in violation of the First Amendment,

retaliated against Plaintiff for sending emails about the conditions at the Hill and staff conduct by having Plaintiff fired from his job assignment and preventing Plaintiff from receiving another job assignment.

**Count 2:**    Defendants Hasemyer, Armbruster-Huffman, Pitts, Spiller, Zang, Schoenbeck, Cheeks, Choate, Williamson, Frazer, Wills, Lawrence, Chambers, and Kilduff, in violation of the First Amendment, retaliated against Plaintiff for sending emails about the conditions at the Hill and staff conduct by (1) issuing Plaintiff false disciplinary reports and finding him guilty of the false charges; (2) keeping Plaintiff in a maximum-security institution after his disciplinary report was expunged; (3) having Plaintiff moved to a high aggression cell-house following release from segregation; and (4) stealing, damaging, and withholding Plaintiff's property.

**Count 3:**    Claim against Hasemyer, Armbruster-Huffman, Pitts, Spiller, Zang, Schoenbeck, Cheeks, Choate, Williamson, Frazer, Wills, Lawrence, Chambers, and Kilduff for conspiring to violate Plaintiff's First Amendment Rights.

(Doc. 18, 58). On June 14, 2024, Defendants filed their motion for partial summary judgment. (Doc. 70, 71). Plaintiff opposes the motion. (Doc. 84).

## LEGAL STANDARDS

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). The moving party is entitled to judgment as a matter of law when the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show that there is no genuine issue of material fact. FED. R. CIV. P. 56(c).

Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act (PLRA). 42 U.S.C. § 1997e(a). The PLRA states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law,

by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." *Id.* The Seventh Circuit requires strict adherence to the

PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that

"[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion of available

administrative remedies must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398

(7th Cir. 2004). Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in

the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d

1022, 1025 (7th Cir. 2005).

As an inmate in the custody of IDOC, Plaintiff was required to follow the grievance

procedures laid out in the Illinois Administrative Code (grievance procedures). 20 ILL. ADMIN.

CODE § 504.800, *et seq*. The grievance procedures direct an inmate is to file a grievance first with

the Counselor within 60 days of the discovery of an incident. *See Id.* § 504.810(a). The grievance

form must:

> [C]ontain factual details regarding each aspect of the offender's complaint,
> including what happened, when, where, and the name of each person who is the
> subject of or who is otherwise involved in the complaint. This provision does not
> preclude an offender from filing a grievance when the names of individuals are not
> known, but the offender must include as much descriptive information about the
> individual as possible.

*Id.* § 504.810(c). Grievances that are unable to be resolved through routine channels are then sent

to a Grievance Officer. *See Id.* § 504.820(a). The Grievance Officer will review the grievance and

provide a written response to the inmate. *See Id.* § 504.830(a). The Grievance Officer must submit

his findings to the Chief Administrative Officer (CAO) within two months after receiving the

grievance. *Id.* § 504.830(e). The CAO then reviews the findings and recommendation of the

Grievance Officer and issues a written decision to the inmate. *Id.* If the inmate is not satisfied with

the response, he can file an appeal with the Administrative Review Board (ARB). *See Id.* §

504.850(a). The ARB must receive the appeal within 30 days after the date of the decision by the CAO. *Id.* Only after a grievance is reviewed by the ARB is it deemed exhausted. *See Pozo*, 286 F.3d at 1023–24.

GRIEVANCES

The parties present the seven following grievances as relevant to the issue of exhaustion of Plaintiff's claims in this case (Doc. 84, p. 5, 9-10):

**1. Grievance #201-7-20, dated July 15, 2020**

In Grievance #201-7-20, Plaintiff grieves the issuance of the July 1, 2020 disciplinary report and subsequent guilty finding resulting from emails sent to his mother on June 5 and 26, 2020. (Doc. 71, p. 176-177). He asserts that the facts do not support the charges. Plaintiff recounts that he witnessed Sergeant Pitts assault a physically small African American inmate with a mental disability and call the inmate a racial slur. In the June 5 email, he states that he was complaining to his mother about the assault and states that such conduct was common at Menard Correctional Center. Plaintiff goes on to recount how following the email, he was interviewed by the Internal Affairs Unit. Plaintiff reported to the officers during the interview that he "was good," and he did not have problems with staff. He claims that Sergeant Pitts found out about the June 5 email and the subsequent interview and had Plaintiff locked in his cell. Pitts was also falsely told by a correctional officer that Plaintiff had stated that Pitts was randomly "beating inmates up." Plaintiff says he was informed that Pitts "was looking for an excuse to fire [Plaintiff] from his janitorial job." Plaintiff then sent a second email to his mother on June 26 describing the mistreatment by Pitts. After sending the second email, Plaintiff was again interviewed by the Internal Affairs Unit. By this time, Pitts and Plaintiff had talked, and Plaintiff reported to the officers that "me and Pitts are good." Plaintiff states that the contents of the emails and these events do not support the charges of the July 1, 2020 disciplinary report. In Grievance #201-7-20, Plaintiff seeks expungement of

his disciplinary report, restoration of his grade status and his janitor job, placed back in his cell at the medium security facility, and to be left alone.

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

### 2. Grievance #210-7-20, dated July 15, 2020

Grievance #210-7-20 is difficult to read, but Plaintiff appears to grieve similar facts as stated in Grievance #201-7-20. In the grievance, Plaintiff indicates that he is grieving staff conduct and retaliation. (Doc. 84-1, p. 1-2). Plaintiff states that on June 5, 2020, he emailed his mother to inform her that the inmates had been placed on level one lockdown following an assault incident involving staff. In the email, he expressed that he was extremely upset because he had been on the phone preparing for un upcoming court date when he "was told to lockdown." Plaintiff told his mother that he had witnessed the assault, and he saw Sergeant Pitts slamming a "small black mentally challenged inmate" into the door and doorway. In the email, Plaintiff described the event as a hate crime. After he sent the email, Plaintiff was interviewed by the Internal Affairs Unit. Plaintiff then sent a second email to his mother telling her (1) about the initial interview with Internal Affairs; (2) that Internal Affairs told Pitts about Plaintiff's first email; (3) that Internal Affairs told Pitts that Plaintiff made certain statements that he never in fact made; and (4) that as a result of Internal Affairs' conduct, Pitts had been "messing" with him. Plaintiff was again interviewed by the Internal Affairs Unit, after sending this second email. He told Internal Affairs that he had spoken with Pitts, and they were good. Plaintiff believed the situation to be over. However, on July 1, 2020, he was told by Correctional Officer Sanders that Internal Affairs was issuing him a disciplinary report. Plaintiff asked Sanders to speak to Superintendent Hasemyer about the disciplinary report because he never gave false information to staff. A few hours later, Pitts and Sanders told Plaintiff to pack his property because Internal Affairs had added a charge to

the disciplinary report, and they wanted Plaintiff in segregation. Plaintiff was found guilty of the fabricated charges on July 9, 2020. Plaintiff grieves that for eleven years he was never issued a disciplinary report and that "someone" is trying to keep him in the maximum-security unit. Plaintiff requests for the issue to be investigated, that he be transferred back the medium security unit, that his job be restored, and to take a polygraph test to verify the facts alleged.

Whether this grievance was fully exhausted is disputed. Defendants argue that no paperwork for Grievance #210-7-20 was produced by the ARB or Menard. (Doc. 70, p. 12).[1] Plaintiff counters that he received a copy of Grievance #210-7-10 from Defendants in discovery. (Doc. 84, p. 5). However, paperwork from the Grievance Office and the ARB was not produced. (*Id.* at p. 6). Plaintiff asserts that he received confirmation that the grievance was received by the ARB, but he never received a decision. (*Id.*). He argues that the grievance should therefore be deemed administratively exhausted, as the administrative process for this grievance was not available due to him never receiving a final response from the ARB. (*Id.* at p. 10).

### 3. Grievance #15-9-20, dated August 31, 2020

In this grievance, Plaintiff indicates that the grievance is "solely covering the Adjustment Committee hearing and it's findings." (Doc. 71, p. 180-181). Plaintiff recounts his conversation with Adjustment Committee Member Lieutenant Schoenbeck. He explained to Schoenbeck that he emailed his mother on June 5, 2020, because he had witnessed an "inmate being jumped on by a staff member." As a result, there was a lockdown that interfered with him being able to prepare for an upcoming court date. Plaintiff told Schoenbeck that nothing in the email violated institutional rules, and when he was interviewed by the Internal Affairs Unit about the email, staff called the interview a "wellness check," not an investigation. Then on June 26, 2020, Plaintiff had

---

[1] Defendants also state that there is no paperwork for Grievance #201-7-20. (Doc. 70, p. 12). This statement is clearly erroneous, and the Court will assume an inadvertent error, as Defendants cite to Grievance #201-7-20 in their brief, and the grievance and responses are included in their exhibits. (Doc. 71, p. 173-177).

an altercation with Sergeant Pitts. Plaintiff emailed his mother complaining about Pitts's mistreatment. Plaintiff was subsequently interviewed by the Internal Affairs Unit about the second email to his mother. During the interview, Plaintiff reported that he spoke to Pitts, and "we are good." The next day, he was taken to segregation and issued a "trumped up ticket." Plaintiff argues that the facts do not support the charges or guilty finding. He asks for the Adjustment Committee's finding to be "thrown out," to be restored back to A Grade status, and to have his job assignment as B wing janitor restored.

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

### 4. Grievance #330-9-20, dated September 28, 2020

In Grievance #330-9-20, Plaintiff marked that the nature of this grievance concerns "personal property." (Doc. 71, p. 169-170). Plaintiff states that on July 1, 2020, Sergeant Pitts and Correctional Officer Sanders told him to pack his property because he was being charged with giving false information to an employee and impeding an investigation and sent to segregation. Before Plaintiff could finish packing, Sanders placed Plaintiff in handcuffs. Plaintiff was taken to segregation, and on July 3, 2020, Plaintiff received his personal property inventory sheet and noticed that a lot of property was missing from the sheet. When he asked about the missing items, he was told that it would be kept in storage. Plaintiff was released from segregation on July 31, 2020, but placed on "back-to-back quarantines." On September 3, 2020, Plaintiff was given his property from storage. However, some property was missing, and items were damaged. Plaintiff alleges that the Internal Affairs Unit and other inmates stole his property. Plaintiff states that his mother called and spoke to Hasemyer, and he told her that he would look into the situation. Plaintiff requests for the matter to be investigated, that his property be returned or that he be reimbursed for the lost property, and that the inmates who have taken his property be treated as having committed

theft. Plaintiff concludes that either the Internal Affairs Unit, Pitts, Sanders, or Hasemyer told the inmates that Plaintiff would not be returning to the Hill, "which became the greenlight to steal [his] property."

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

### 5. Grievance #323-9-20, dated September 28, 2020

Plaintiff marks that this grievance pertains to personal property, staff conduct, and excessive discipline. (Doc. 71, p. 165-166). Plaintiff complains that he was taken to segregation by the Internal Affairs Unit, in collusion with other staff members of Menard, in retaliation for witnessing a hate crime, and in retaliation for a recent court ruling made in his favor and against the Internal Affairs Unit. He goes on to state that he was given thirty days in segregation, demoted to C-grade status, and was denied privileges by an Adjustment Committee "headed by a former(?) member of Internal Affairs." When he was eventually released from segregation, and his property was returned to him on August 21, 2020, he noticed that various legal documents were missing. Plaintiff writes that he was told by correctional officers that "possibly the whole delay with [his] property was because I.A. had it!" He asserts that I.A. has a history of meddling in his court cases. Plaintiff seeks for Menard to end the practice of instituting excessive punishment and for Menard to cease its involvement in his criminal case.

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

### 6. Grievance #100-10-20, dated October 7, 2020

In this grievance, Plaintiff states that following the completion of his time in segregation and the quarantine period in the Menard maximum-security facility, he was told he would be transferred back to the Hill. (Doc. 71, p. 109-110). He grieves that his due process and equal

protection rights are being violated, and he is being subjected to cruel and unusual punishment because he is wrongfully being held at Menard's maximum-security unit due to a "hold" implemented by the Internal Affairs Unit. He states that he has asked various staff members what a hold is, and no one can give him an answer. He states that he was sanctioned with thirty days of segregation based on fabricated charges, but the Adjustment Committee did not recommend a disciplinary transfer. Plaintiff argues that there is nothing to justify a "hold" or having him remain in a maximum-security facility. He states that his security classification is "medium," and therefore, he should be at a medium-security prison. Plaintiff requests a transfer to Graham Correctional Center or Centralia Correctional Center.

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

### 7. Grievance #216-2-21, dated February 16, 2021

In the grievance, Plaintiff recounts that he was transferred from Menard's medium-security facility to segregation at the maximum-security facility on July 1, 2020, after receiving fabricated disciplinary report issued by the Internal Affairs Unit. (Doc. 71, p. 127-132). His disciplinary report was heard by a former member of the Internal Affairs Unit, Joshua Schoenbeck, who found Plaintiff guilty. The disciplinary report was expunged by the Administrative Review Board on January 16, 2021. The Administrative Review Board instructed Plaintiff that if he wanted to be transferred back to the medium-security facility and receive his job back, then he would need to discuss the issue with his current counselor and placement staff. Plaintiff grieves that on January 25, 2021, Internal Affairs Lieutenant Zang wrote him another disciplinary report for abuse of privileges, conspiracy to commit, and trading and trafficking. Plaintiff states that this disciplinary report was written in retaliation for the Administrative Review Board expunging the July 1, 2020 disciplinary report. The receiving officer, Major Elevsizer, deemed the charge a minor infraction

and "submitted it to the program unit." On January 28, 2021, Plaintiff was told by his counselor that "there was no ticket on the computer for [him.]" Plaintiff had a hearing before Adjustment Committee Member Schoenbeck on February 2, 2021. Plaintiff objected to having the disciplinary report heard by Schoenbeck due to Schoenbeck being partial. He told Schoenbeck that because it was a minor infraction, the disciplinary report should be heard by the program unit. Plaintiff pled "not guilty" to the disciplinary report and stated that Sergeant Pitts had allowed other inmates to steal his property. Plaintiff contended that he did not abandon all his clothes and property and had expected to return to the medium-security unit. Plaintiff was found guilty and sanctioned with thirty days of C-grade status. Plaintiff writes that Menard is protecting "what is really going on at the M.S.U.," and the Internal Affairs Unit protects "it's snitches/pets at the M.S.U." He states that he has not had a disciplinary report issued since 2009, but once he claimed to have witnessed Sergeant Pitts, a former member of the Internal Affairs Unit, committing a hate crime, he cannot "get I.A. (Menard's Gestapo) off [his] back." Plaintiff requests for expungement of the January 25, 2021 disciplinary report, for his property to be returned to him, to be transferred to Graham Correctional Center, to have all his allegations investigated, and for the removal of Schoenbeck from the Adjustment Committee.

The parties do not dispute that this grievance was submitted and appealed in accordance with grievance procedures.

ANALYSIS

In the Court's merit review orders, Plaintiff's claims were divided into Counts 1, 2, and 3, with Count 2 having 7 parts. (Doc. 18, 58). The Court will take each count and part in turn.

## I.    Count 1

In Count 1, Plaintiff pleads in the First Amended Complaint that Defendant Hasemyer, in retaliation for complaining to family and friends about staff conduct and conditions at the Hill, had

him fired from his job in the dietary department and prevented him from receiving another job assignment. Defendants state, and Plaintiff does not dispute, that the only to grievances that mention restoration of Plaintiff's job are Grievance #201-7-20 and Grievance #15-9-20. Defendants argue that neither grievance can serve to exhaust Plaintiff's claim against Hasemyer in Count 1 because they do not name or refer to Hasemyer. (Doc. 70, p. 15).

Plaintiff argues that as the acting superintendent at Menard Correctional Center, Hasemyer would have been alerted to Plaintiff's grievances alleging the firing from his job assignment due to the retaliatory actions by one of his staff members, as well as Plaintiff being prevented from further assignment to another job. (Doc. 84, p. 10-11). Therefore, Defendants have not met their burden of demonstrating that Plaintiff failed to exhaust his administrative remedies as to Count 1.

The events described in Grievance #201-7-20 and Grievance #15-9-20 are completely unrelated to Plaintiff's allegations in Count 1 – that he was fired from his *dietary* job and prevented from further employment by Hasemyer in retaliation for disclosing in an email that Hasemyer had stolen Menard property. (*See* Doc. 61, p. 8-9). The grievances pertain only to the wrongful issuance of a disciplinary report and guilty finding based on Plaintiff sending emails containing details of misconduct by Sergeant Pitts in June 2020. Although Plaintiff states that he believes that "someone was just trying to get [him] off the Hill," in Grievance #201-7-20, and that Internal Affairs had "unjust motives" in Grievance #15-9-20, the grievances are devoid of wrongful conduct on the part of Hasemyer and details concerning the firing from Plaintiff's kitchen job assignment. And nothing in the grievances allow for the conclusion that on some broader level Plaintiff was complaining about repeated firings for sending emails, as opposed to the single instance when he lost his job as a janitor because of receiving a disciplinary report. *See Waldrop v. Wexford Health Sources, Inc.,* 646 F. App'x 486, 490 (7th Cir. 2016) (citing *Turley v. Rednour,* 729 F. 3d 645, 650 (7th Cir. 2013)). Furthermore, regardless of whether Hasemyer reviewed or was aware of

Grievance #201-7-20 and Grievance #15-9-20, an assertion that is not supported by the record,[2] because the grievances do not mention Hasemyer or describe the alleged events involving Hasemyer, the grievances do not meet the PLRA's requirements of alerting "the prison to the nature of the wrong for which redress is sought[.]" *Westefer v. Snyder,* 422 F.3d 570, 580 (7th Cir. 2005) (citing *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). Thus, Plaintiff has failed to exhaust his claims against Hasemyer as asserted in Count 1. Count 1 will be dismissed from this case without prejudice.

## II.   Count 2

**a.** First Amendment claim against Hasemyer, Pitts, Armbruster-Huffman, Frazer, Williamson, Wills, and Lawrence for retaliating against Plaintiff by issuing him the false disciplinary report dated July 1, 2020.

Defendants point to two grievances relevant to the retaliatory disciplinary report, Grievance #201-7-20 and Grievance #330-9-20. Defendants argue that the grievances only implicate Armbruster-Huffman and Pitts as being involved in the disciplinary report. (Doc. 70, p. 16-17). Therefore, Plaintiff has failed to exhaust his administrative remedies against Hasemyer, Wills, Williamson, Frazer, and Lawerence, as to his Claims in Count 2, part 1.

Plaintiff argues that the two grievances mentioned by Defendants, as well as Grievance #15-9-20 and Grievance #210-7-20, all reference Plaintiff's July 1, 2020 false disciplinary report. (Doc. 84, p. 12-14). He states that the four grievances make repeated references and detail issues involving the issuance of the disciplinary report by officers assigned to the Internal Affairs Unit. These officers include Frazer and Williamson, who were assigned to the Menard Internal Affairs Unit and were identified as unknown defendants in the original Complaint. Thus, Plaintiff concludes that the grievances contained enough information to alert officials that members of the

---

[2] "The Court will disregard any asserted fact that is not supported with a citation to the record." LR-SDIL 56.1(f).

Internal Affairs Unit were mistreating him for complaining about conditions and staff at the Hill to family and friends.

As to Defendant Hasemyer, Plaintiff points out that in Grievance #210-7-20, he writes that he asked Sanders to speak with Superintendent Hasemyer about the disciplinary report. Plaintiff argues that it can reasonably be assumed that Sanders did indeed speak to Hasemyer about the disciplinary report, alerting Hasemyer and giving him a fair opportunity to address Plaintiff's concerns. As such, Plaintiff believes that he successfully exhausted his administrative remedies as to Hasemyer. Likewise, because they were wardens, Plaintiff contends that Wills and Lawrence would have been notified of the allegations regarding staff conduct, as stated in Plaintiff's four grievances, and they would have been alerted to Plaintiff's concerns that he had been issued a false disciplinary report. Thus, Plaintiff argues he also has exhausted his claims against Wills and Lawrence.

The Court finds that Grievances #201-7-20, #330-9-20, and #15-9-20[3] serve to grieve Plaintiff's claim that Frazer and Williamson, who were members of the Internal Affairs Unit, retaliated against Plaintiff by issuing him a false disciplinary report. The fact that Plaintiff did not name Frazer or Williamson in the grievances is not "fatal to the issue of exhaustion." *See Arce v. Wexford Health Services*, No. 18-cv-1348-SMY-GCS, 2019 WL 6702692, at *5 (S.D. Ill. Oct. 9, 2019). The grievance procedures do not preclude an inmate from filing an inmate from filing a grievance when an individual's name is unknown, *see* 20 ILL. ADMIN. CODE 504.810(c), and inmates are only required to identify individuals to the extent necessary to serve a grievance's function of giving "prison officials a fair opportunity to address [the prisoner's] complaints." *Maddox v. Love,* 655 F. 3d 709, 722 (7th Cir. 2011)). Plaintiff's grievances contain sufficient

---

[3] Because these three grievances serve to exhaust Plaintiff's claims against Frazer and Williamson in Count 2, part 1, the Court need not address whether Plaintiff was prevented from exhausting Grievance #210-7-20.

factual details of his complaint to alert prison officials to his issues. The grievances describe Plaintiff's protected conduct, sending the emails complaining about staff conduct, and the alleged retaliatory acts, "fabricated charges" by members of the Internal Affairs Unit. (Doc. 71, p. 181). They even call into question the motivation of the Internal Affairs officers involved. In Grievance #15-9-20, Plaintiff states that during the disciplinary hearing he asked Adjustment Committee Member Schoenbeck whether he, Schoenbeck, had received copies of his emails to his mother, and Schoenbeck asked why they were relevant. Plaintiff responded that the emails, which were central to "the so-called I.A. investigation[,] back [his] claims, why else would I.A. not attach them to the ticket?" (Doc. 71, p. 181). Plaintiff goes on to write, "It seemed as if I.A. had an ulterior motive…I've been doing this for a long time! The next day I was taken to seg. With a trumped up ticket…How am I guilty of writing emails (to my mother) that contradict my I.A. interviews." (*Id.*). In Grievance #330-9-20, Plaintiff complains that after he informed Sergeant Pitts and Correctional Officer Sanders that the original charge of giving false information to an employee did not "carry" segregation time, the officers returned with new charges and told Plaintiff that "I.A. bumped up the charges to a (110) impeding an investigation." (*Id.* at p. 169). And in Grievance #201-7-20, Plaintiff grieves, "Someone was taking my emails out of context or someone was just trying to get me off of the Hill. The facts do not support my charges! I was accused of sending out an email to my mother." (Doc. 71, p. 176-177). He goes on to grieve, "It was like I.A. wanted me to have issues with staff." (*Id.* at p. 177). Construing the evidence in Plaintiff's favor, Grievances #201-7-20, #330-9-20, and #15-9-20 served their necessary function, and the motion for summary judgment is denied as to Count 2, part 1 against Frazer and Williamson.

Summary judgment is granted, however, as to Count 2, part 1 against Hasemyer, Wills, and Lawrence. While these same grievances, Grievances #201-7-20, #330-9-20, and #15-9-20, may have alerted Hasemyer, Wills, and Lawrence about Plaintiff's issues and given these

Defendants an opportunity to address Plaintiff's complaints,[4] the grievances do not describe Hasemyer, Wills, and Lawrence as responsible for or involved in the wrongful issuance of the disciplinary report. The IDOC grievance procedures require inmates to include information about what happened, when, where, and if known, the name or identifying information about each person involved in a complaint. 20 Ill. Admin. Code § 504.810(c). The grievances do not attribute wrongful conduct to Hasemyer, Wills, and Lawrence, so they are insufficient to exhaust the claim against them for the retaliatory disciplinary report.

The same can be said for Grievance #210-7-20. Even if it is true that Plaintiff was prevented from fully grieving Grievance #210-7-20, the Court must "also look at whether the content of the grievance[] was sufficient to cover [his] claims against" Hasemyer, Wills, and Lawerence. *Russell v. Wexford Health Sources, Inc.,* No. 19-cv-681-MAB, 2021 WL 793994, at *3 (S.D. Ill. Mar. 2, 2021) (citing *Sapp v. Kimbrell,* 623 F. 3d 813, 823-24 (9th Cir. 2010)). Only Hasemyer is mentioned in Grievance #210-7-20. Plaintiff states that he asked Correctional Officers Sanders to speak to Hasemyer about the disciplinary report about to be issued because he never gave false information to staff. The grievance, again, does not describe any conduct attributable to Hasemyer or in any way mirror the allegations in the First Amended Complaint that support Plaintiff's claim that Hasemyer was involved in the issuance of the false disciplinary ticket – in the First Amended Complaint, Plaintiff asserts that he was told that Hasemyer was "gunning for him." (Doc. 61, p. 12). Furthermore, Plaintiff's vague assertions that he was told that "someone is trying to block his return" to the Hill and that he believes "someone had their hands in this" – appearing to reference the fact that the emails he sent to his mother were not provided to the Adjustment Committee – are not sufficient to meet the level detail required in the grievance procedures. The grievance is devoid

---

[4] The Court notes that this argument by Plaintiff is not entirely supported by the record. Only Wills signed the grievances, Plaintiff does not point to any evidence that Hasemyer and Lawrence reviewed or were aware of the grievances. (*See* Doc. 71, p. 167, 174, 178).

of conduct on the part of Hasemyer, Wills, and Lawerence, and cannot serve to exhaust his claims in Count 2, part 1.

    **b.**  Defendants do not move for summary judgment as to the claim in Count 2, part 2.

    **c.**  First Amendment claim against Spiller and Hasemyer for retaliating against Plaintiff by withholding Plaintiff's property for a month after he was released from segregation.

Defendants argue that only Grievance #330-9-20 mentions the withholding of his property. (Doc. 70, p. 17). The grievance, however, cannot serve to exhaust Plaintiff's claim in Count 2, part 3 because the grievance does not mention Spiller and only alleges that Hasemyer told Plaintiff's mother that he would look into the status of Plaintiff's property.

Plaintiff argues that Grievance #330-9-20 serves to exhaust his claim against Hasemyer. (Doc. 84, p. 14). In the grievance, Plaintiff states that his mother called Superintendent Hasemyer about his missing property and that Hasemyer told her he would "look into" the issue. Plaintiff contends that this statement shows that Plaintiff gave adequate notice to Hasemyer to alert him of Plaintiff's claims against him. Thus, he argues that he fully exhausted his administrative remedies against Hasemyer as to Claim 2, part 3.

As to Spiller, Plaintiff argues that Grievance #323-9-20 sufficiently grieves his claims. In this grievance, Plaintiff states that he was told by correctional officers that the delay in receiving his property possibly was because if Internal Affairs. Spiller was an officer assigned to the Internal Affairs Unit and would have been alerted to Plaintiff's issues and claims against him.

For similar reasons previously discussed, Grievance #330-9-20 could not have served to exhaust Plaintiff's retaliation claim concerning his property against Hasemyer. Although Plaintiff's mom alerted Hasemyer that Plaintiff was missing property, the grievance does not allow a reasonable fact finder to conclude that Plaintiff believed that Hasemyer was involved in the temporary withholding of his property and that Hasemyer did so with a retaliatory motive. The

most that can be taken from the grievance is that Hasemyer failed to rectify the wrongful conduct of subordinate staff, which is a different allegation than retaliation claim stated in the First Amended Complaint. Accordingly, summary judgment is granted as to Hasemyer in Count 2, part 3.

The Court also finds that Grievance #323-9-20 failed to serve to exhaust Plaintiff's claim against Spiller. The facts stated in the grievance do not align with the allegations in the First Amended Complaint. In the First Amended Complaint, Plaintiff alleges that Spiller retaliated against him for emailing family and friends regarding the conditions at the Hill by withholding all of Plaintiff's property for over a month once he was placed in general population at Menard maximum-security facility. (Doc. 61, p. 15, 18). When he did receive his property, Plaintiff was given only a small amount of his clothing and his hygiene items, and his TV and radio were damaged. (*Id.*). In the grievance, Plaintiff claims he was placed in segregation by Internal Affairs in retaliation for 1) witnessing a hate crime; and 2) due to a recent court ruling in his favor. (Doc. 71, p. 166). When his segregation time ended, he was told he had to remain in the segregation unit because his gallery was on quarantine. He was moved from 4 gallery to 6 gallery, and his "seg property" was taken, mostly "legal papers, whites, and cosmetics because property is restricted on quarantine." He writes that he received the property back on August 21, 2020, and various documents needed for his legal cases were missing. Plaintiff asserts that he was told by correctional officers that the delay in receiving his property "possibly" was because Internal Affairs "had it."

No reasonable fact finder could conclude that Grievance # 323-9-20 gave prison officials the opportunity to resolve the allegation of retaliation against Spiller regarding Plaintiff's property prior to filing this lawsuit. As mentioned, Plaintiff does not have to identify Spiller by name, and it is also not necessary for him to plead a legal theory. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). But a prisoner must still include details "regarding each aspect of [his] complaint," 20

Page 19 of 27

ILL. ADMIN. CODE. 504.810(c), sufficient to "alert[ ] the prison to the nature of the wrong for which

redress is sought." *Strong,* 297 F.3d at 650. Not only does the grievance not name Spiller, but it

neither describes the protected conduct, sending private emails about conditions at the Hill and

staff misconduct, nor the retaliatory act, the withholding of *all* of his property once placed in

general population. *See Maus v. Pagel,* No. 23-2855, 2024 WL 1342582, at *2 (7th Cir. 2024)

(citing *Bowers v. Dart,* 1 F. 4th 513, 517-18 (7th Cir. 2021)). The grievance is focused on

Plaintiff's C-grade status, missing legal documents, and interference with his criminal case. Thus,

the grievance lacked sufficient details to exhaust Plaintiff's claims in Count 2, part 3 against

Spiller. Summary judgment is granted as to Spiller in Count 2, part 3.

> **d.** First Amendment claim against Hasemyer, Spiller, Wills, and Lawrence for retaliating
> against Plaintiff by having him reclassified or otherwise directed to remain at Menard's
> maximum-security facility with highly aggressive inmates after his disciplinary report
> had been expunged.[5]

Pointing to Grievance #100-10-20, Defendants argue that Plaintiff has failed to exhaust his

administrative remedies with respect to having him remain at Menard maximum-security facility

as to Hasemyer, Spiller, and Lawrence, as the only defendant mention in the grievance is Wills.

Defendants further argue that Plaintiff failed to exhaust his claim that he was retaliated against by

being reclassified as to all Defendants, Hasemyer, Spiller, Lawrence, and Wills, as no grievance

mentions that he was reclassified. (Doc. 70, p. 17).

Plaintiff does not dispute the assertion that he failed to exhaust Count 2, part 4 as to

Hasemyer and Lawrence. He argues that he effectively exhausted as to Wills, as well as Spiller.

---

[5] Although the Court originally described Count 2, part 4 as a retaliation claim for "having Plaintiff reclassified and
remain at Menard maximum-security facility in a cell-house with highly aggressive inmates after his disciplinary
report had been expunged by the Administrative Review Board," (Doc. 18, p. 13, Doc. 58, p. 3), a more accurate
description of Count 2, part 4, based on the wording in the First Amended Complaint and the Court's summary of the
facts, is as follows: "having Plaintiff reclassified *or otherwise directed* to remain at Menard maximum-security facility
in a cell-house with highly aggressive inmates after his disciplinary report had been expunged by the Administrative
Review Board." (*See* Doc. 61, p. 19) (emphasis added); (Doc. 18, p. 12) (stating that Plaintiff alleges that he was
retaliated against by Defendants for "refusing to transfer him back to a medium-security facility").

He states that Grievance #100-10-20 clearly grieves that he was blocked from being transferred to a medium-security facility due to an "Internal Affairs Hold." (Doc. 84, p. 15). Because Spiller was an officer assigned to the Internal Affairs Unit, Plaintiff argues that the grievance directly implicates Spiller regarding having him remain at Menard maximum-security facility.

The Court agrees that Defendants have not met their burden of demonstrating that Plaintiff failed to exhaust Count 2, part 4 as to Spiller and Wills. In the First Amended Complaint, Plaintiff claims that Defendants retaliated against him by having him:

> [R]eclassified or otherwise directed to remain at Menard maximum-security unit after his disciplinary report that was the basis for Plaintiff's assignment to segregation at Menard maximum-security unit had been expunged by the Administrative Review Board…

(Doc. 61, p. 19). In Grievance #100-10-20, Plaintiff grieves that he is wrongfully being kept at Menard maximum-security facility due to an arbitrary "hold" placed on him by the Internal Affairs Unit. (Doc. 71, p. 110). He writes that, despite being told by Wills that he would be returning to the Hill, the Internal Affairs Unit is allowed to do what they want. He states that Menard employees, including administrators and members of the Internal Affairs Unit "have directly violated [his] rights," and he asserts that Menard is corrupt. (*Id.*). In Grievance #216-2-21,[6] Plaintiff expresses that he is still being wrongfully kept at Menard maximum-security facility for arbitrary reasons. He writes:

> Once I claimed to witnessing ex-I.A. Sgt. Pitts committing what I perceived as a hate crime. I can't get I.A. (Menard's Gestapo) off my back. Lt. Zang even told me they'd do whatever to block me from ever leaving Menard….It is known I am trying to transfer to Graham…I.A. is using that against me! They want me to give up everything I know about the MSU! (or not!).

---

[6] Although the parties do not cite to Grievance #216-2-21, the Court may consider materials not cited by either party in reaching its conclusion. *See* FED. R. CIV. P. 56(c)(3).

Page 21 of 27

(*Id.* at p. 132). In response, the Grievance Officer wrote that transfers were an "administrative decision." (*Id.* at p. 126). These grievances provide sufficient notice of the nature of Plaintiff's claim – that he was sent to the maximum-security facility and being kept there by members of the Internal Affairs Unit, which includes Spiller, and administration, which includes Wills, for fabricated reasons after sending emails reporting staff misconduct. Summary judgment is granted as to Count 2, part 4 against Hasemyer and Lawrence, but is denied as to Spiller and Wills.

    **e.**  First Amendment claim against Pitts, Chambers, and Choate for retaliating against Plaintiff by instructing other inmates to steal his property.

Defendants argue that summary judgment should be granted as to Chambers and Choate, as Grievance #216-2-21 only mentions Pitts as involved in the taking of Plaintiff's property. (doc. 70, p. 18).

Plaintiff counters that summary judgment should be denied as to Chambers, who was employed as a correctional officer assigned to personal property at Menard. Any grievance alleging theft of personal property, and especially a grievance alleging that staff members were directing inmates to steal the personal property of another inmate, would have specifically alerted Chambers due to his role. (Doc. 84, p. 15-16).

The Court grants the motion for summary judgment as to Count 2, part 5 against Chambers and Choate. The grievance may have alerted Chambers that Plaintiff believed that Sergeant Pitts allowed inmates to steal his property, and he was being subjected to ongoing retaliation by the Internal Affairs Unit.[7] Nothing in the grievance, however, can support the inference that Plaintiff believed that Chambers or staff within the property department itself participated or were somehow involved in theft of Plaintiff's property. *See Roberts v. Neal*, 745 F.3d 232, 236 (7th Cir. 2014) (explaining "fatal defect" in grievance was "the absence of anything in it to indicate that [the

---

[7] Plaintiff does not cite to any exhibit in the record in support of this argument.

defendant] was the target"). Accordingly, summary judgment is granted as to Count 2, part 5 against Chambers and Choate.

      **f.**  First Amendment claim against Cheeks and Zang for retaliating against Plaintiff by issuing him the second false disciplinary report.

Defendants argue that Grievance #216-2-21 only mentions Zang and so the grievance cannot serve to exhaust his claim against Cheeks. (Doc. 70, p. 18). Plaintiff does not oppose summary judgment as to this point. Defendants' argument, however, is clearly not supported by the record.[8] On page 2 of Grievance #216-2-21, Plaintiff grieves that after witnessing Pitts assault another inmate, "I sent an email to my mother in June 2020 telling her what I seen. Internal Affairs then began their unconstitutional campaign against me for being what I've been called a 'race traitor/or trader." (Doc. 71, p. 127-128). He goes on to write later that he was interviewed by Cheeks about his claim that Sergeant Pitts facilitated the theft of his property, and "he knew right away [Cheeks] had ties to Menard and it's staff." (Doc. 71, p. 128). On page 6 of the grievance, Plaintiff describes his second disciplinary report as:

> [A]n accumulation of retaliation for one I.A. ticket being expunged. ISI Cheeks half-ass, biased interview, Menards ongoing protection of what is really going on at the MSU, I.A.'s protection of snitches/pets in the M.S.U. I've not had a ticket since 2009. Once I claimed to witnessing ex-I.A. Sgt. Pitts committing what I perceived as a hate crime. I can't' get I.A. (Menard's Gestapo) off my back."

(*Id.* at p. 132). It is clear from these statements that Plaintiff believed that mistreatment by staff was initially motivated by the emails he sent complaining about staff misconduct and continued once the July 1, 2020 disciplinary report was expunged. A liberal reading of Grievance #216-2-21 suggests that staff, including Cheeks, where investigating Plaintiff and issuing him disciplinary reports for illegitimate reasons, such as retaliation. As such, the Court finds that Defendants have

---

[8] "Rule 56(e) permits judgment for the moving party only '*if appropriate*—that is, if the motion demonstrates that there is no genuine issue of material fact *and* that the movant is entitled to judgment as a matter of law.'" *Johnson v. Gudmundsson,* 35 F.3d 1104, 1112 (7th Cir. 1994) (citing *Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 332 (7th Cir. 1993) (emphasis in original)).

not met their burden, and Plaintiff's grievance sufficiently exhausted his claim in Count 2, part 6

against Cheeks.

      **g.** First Amendment claim against Kilduff for retaliating against Plaintiff by denying his
         grievances.

Defendants argue that Plaintiff did not mention Kilduff or any other personnel denying

grievances in any of his grievances, and so, he failed to exhaust this claim against Administrative

Review Board Member Kilduff. (Doc. 70, p. 18). Plaintiff points out that in Grievance #216-2-21,

he grieves, "My dozen or so grievances worked their way through my counselor, former

Correctional Officer Quick, to Grievance Officers that deny 99% of all inmate grievance, and then

approved by a non-existent warden who assigns others to sign off on these grievances." (Doc. 84,

p. 17) (quoting Doc. 71, p. 128)). This grievance was ultimately denied by the Administrative

Review Board. Plaintiff argues that Kilduff, as a member of the Administrative Review Board,

would or should have seen this grievance and been alerted to Plaintiff's claim of the systematic

denial of his grievances. Therefore, according to Plaintiff, he has exhausted his claim against

Kilduff.

The Court agrees with Defendants that Grievance #216-2-21 fails to exhaust Plaintiff's

claim against Kilduff in Count 2, part 7. In the First Amended Complaint, Plaintiff asserts that at

the second disciplinary hearing before the Adjustment Committee, Schoenbeck stated that Plaintiff

was "lucky for having the first disciplinary report expunged but now 'we got one of our own in

the ARB waiting on your next grievance.'" (Doc. 61, p. 17). He asserts that Schoenbeck was

referring to Administrative Review Board Member Kilduff, who dismissed his next grievance and

every grievance following. Grievance #216-2-21, however, grieves denial of Plaintiff's grievances

at the institutional level prior to his July 1, 2020 disciplinary report being expunged on January

16, 2021. Kilduff's alleged retaliatory conduct did not occur until after the second hearing before

Schoenbeck on February 2, 2021. The grievance does not indicate that Plaintiff believed he had recently started being retaliated against by Kilduff or staff at the Administrative Review Board level. Accordingly, summary judgment is granted as to Count 2, part 7.

### III.    Count 3

For Count 3, Plaintiff asserts that Hasemyer, Armbruster-Huffman, Pitts, Spiller, Zang, Schoenbeck, Cheeks, Choate, Williamson, Frazer, Wills, Lawrence, Chambers, and Kilduff conspired to violate Plaintiff's First Amendment rights. Defendants argue that none of Plaintiff's grievances provide "factual details" of a conspiracy, and he has failed to exhaust his administrative remedies as to Count 3. (Doc. 70, p. 19).

The Court, however, agrees with Plaintiff that in several of his grievances he directly asserts a collusive effort between the staff members at Menard to violate rights. (Doc. 84, p. 18) (citing Grievance #323-9-20, Grievance #100-10-20, Grievance #216-2-21). Notably, in Grievance #100-10-20, Plaintiff writes:

> Employees at Menard, from administrators, internal affairs, grievance office, to clinical services continue to violate my Due Process Rights under the Equal Protection Clause and my right to not be subjected to cruel and unusual punishment! The above employees have directly violated my rights, or colluded with those directly involved, or have turned a blind eye to these violations of my protected rights.

(Doc. 71, p. 110). In Grievance #216-2-21, he grieves, "Once I claimed to witnessing ex- I.A. Sgt. Pitts committing what I perceived as a hate crime, I can't get I.A. (Menard's Gestapo) off my back. Lt. Zang Even tole me they'd do whatever to block me from ever leaving Menard." (*Id.* at p. 132).

The grievance process is not intended to provide individual notice to each defendant who might be sued later; nor is Plaintiff required to articulate a legal theory in his grievances. Rather, the process is designed to provide prison officials with notice of the problem and give them an opportunity to fix it. *Maddox,* 655 F.3d at 722 (citing *Jones v. Bock*, 549 U.S. 199, 219 (2007);

*Turley v. Rednour,* 729 F.3d at 649)). As stated above, Plaintiff's grievances sufficiently placed prison officials on notice of Plaintiff's individual complaints regarding retaliation by Defendants Pitts, Armbruster-Huffman, Williamson, Frazer, Schoenbeck, Spiller, Wills, Zang, and Cheeks. The facts alleged in these grievances, taken in combination with the statements quoted above in Grievance #100-10-20 and Grievance #216-2-21 adequately informed the staff reviewing Plaintiff's grievances that he believed the misconduct by staff and his mistreatment was coordinated, and thus, sufficiently alerted prison officials of his conspiracy claim as to Pitts, Armbruster-Huffman, Williamson, Frazer, Schoenbeck, Spiller, Wills, Zang, and Cheeks.

The same cannot be said for Defendants Hasemyer, Lawrence, Chambers, Choates, and Kilduff. Since Plaintiff failed to grieve retaliatory conduct on the part of these individuals as alleged in the First Amended Complaint, there is no way for a prison official to infer from the grievances that they participated in the conspiracy to violate his First Amendment rights. Accordingly, summary judgment is granted in part as to Defendants Hasemyer, Lawrence, Chambers, Choates, and Kilduff.

### DISPOSITION

For the reasons stated above, the Motion for Partial Summary Judgment for Failure to Exhaust Administrative Remedies (Doc. 70) filed by Defendants is **GRANTED in part** and **DENIED in part**. All claims against Defendants Hasemyer, Lawrence, Chambers, Choates, and Kilduff are **DISMISSED without prejudice** due to Plaintiff's failure to exhaust his administrative remedies prior to initiating this lawsuit. Plaintiff is now proceeding on the remaining counts:

> **Count 2:** Defendants Armbruster-Huffman, Pitts, Williamson, Frazer, Schoenbeck, Spiller, Wills, Cheeks, and Zang, in violation of the First Amendment, retaliated against Plaintiff for sending emails about the conditions at the Hill and staff conduct by (1) issuing Plaintiff false disciplinary reports and finding him guilty of the false charges; (2) keeping Plaintiff in a maximum-security institution after his disciplinary report was expunged; and (3) orchestrating or

otherwise facilitating the theft of Plaintiff's property.

**Count 3:**    Claim against Armbruster-Huffman, Pitts, Williamson, Frazer, Schoenbeck, Spiller, Wills, Cheeks, and Zang for conspiring to violate Plaintiff's First Amendment Rights.

The stay on merits discovery is **LIFTED**, and the parties can proceed with discovery on the merits. A new scheduling order will be entered by separate order.

**IT IS SO ORDERED.**

**DATED: March 24, 2025**

_____*s/Stephen P. McGlynn*_____
**STEPHEN P. MCGLYNN**
**United States District Judge**